## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | **CIVIL ACTION NO: 1:11-cv-06208** |
| Plaintiff, | **Honorable Elaine E. Bucklo** |
| v. | |
| WINDSOR BROKERS, LTD., | |
| Defendant. | |

### CONSENT ORDER FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF AND PENALTIES AGAINST DEFENDANT WINDSOR BROKERS, LTD.

### I.      BACKGROUND

On September 7, 2011, Plaintiff Commodity Futures Trading Commission

("Commission" or "CFTC") filed a Complaint against Defendant Windsor Brokers, Ltd.

("Defendant" or "Windsor") seeking injunctive and other equitable relief and penalties for

violations of the Commodity Exchange Act ("Act"), 7 U.S.C. § 1 *et seq.* (2006), as amended by

the Food, Conservation and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC

Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18,

2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-

Frank Act"), Pub. L. No. 111-203, Title VII §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010),

to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Commission Regulations ("Regulations")

promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2011).

## II.  CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Defendant Windsor without a trial on the merits or any further judicial proceedings, Defendant Windsor, ~~by and through its attorneys:~~ ~~

1.  Consents to entry of this Consent Order for Permanent Injunction and Other Equitable Relief and Penalties Against Defendant Windsor ("Consent Order");

2.  Affirms that Windsor's consent to entry of this Consent Order is voluntary, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce it to consent to entry of this Consent Order;

3.  Acknowledges service of the summons and Complaint;

4.  Admits the jurisdiction of this Court over it and the subject matter of this action pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1;

5.  Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, and Section 2(c)(2)(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C);

6.  Admits that venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(e);

7.  Waives:

   A.  any and all claims that Windsor may possess under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, , relating to, or arising from, this action;

2

B.    any and all claims that Windsor may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

C.    any and all claims of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of this Consent Order or any order imposing restitution, a civil monetary penalty, or any other relief; and

D.    any and all rights of appeal from this action;;

8.    Consents to the continued jurisdiction of this Court over it for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Windsor now or in the future resides outside the jurisdiction of this Court;

9.    Agrees that it will not oppose enforcement of this Consent Order on the ground that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waives any objection based thereon;

10.    Agrees that neither Windsor nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Windsor's: (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Windsor shall take all steps necessary to ensure that all of its agents and employees under its authority or control understand and comply with this agreement;

3

11.  By consenting to the entry of this Consent Order, neither admits nor denies the allegations of the Complaint or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which it admits.  Further, Windsor agrees and intends that the allegations of the Complaint shall be taken as true and correct and be given preclusive effect, without further proof, in the course of (a) any current or subsequent bankruptcy proceeding filed by, or on behalf of, or against the Defendant; (b) any proceeding pursuant to Section 8a of the Act, to be codified at 7 U.S.C. §§ 12a, and/or Part 3 of the Regulations, 17 C.F.R. §§ 3.1 *et seq.* (2011); and (c) any proceedings to enforce the terms of this Consent Order;

12.  Agree(s) to provide immediate, during the ensuing fifteen (15) months, notice to this Court and the Commission by certified mail, in the manner required by paragraph 57 of Part X of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against it, whether inside or outside the United States, and

13.  Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Windsor in any other proceeding.

### III.    FINDINGS AND CONCLUSIONS

**A.    Findings of Fact**

#### i. Good Cause for Entry of this Consent Order

14.  The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C.

4

§ 13a-1, and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C.
§ 2(c)(2), as set forth herein.

### ii. Parties to this Consent Order

15.   Plaintiff **Commodity Futures Trading Commission** is an independent federal
regulatory agency charged by Congress with administering and enforcing the Act, as amended,
to be codified at 7 U.S.C. §§ 1 *et seq.,* and the Regulations, 17 C.F.R. §§ 1.1 *et seq.* (2011).

16.   Defendant **Windsor Brokers. Ltd.** is a company located in Cyprus that solicits
and accepts orders for off-exchange foreign currency ("forex") transactions.  Windsor has
never been registered with the Commission in any capacity.

## B.    Conclusions of Law

### i.  Jurisdiction and Venue

17.   This Court has jurisdiction over Windsor and the subject matter of this action
pursuant to Section 6c(a) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(a), which
provides that whenever it shall appear to the Commission that any person has engaged, is
engaging, or is about to engage in any act or practice constituting a violation of any provision
of the Act or any rule, regulation, or order thereunder, the Commission may bring an action in
the proper district court of the United States against such person to enjoin such act or practice,
or to enforce compliance with the Act, or any rule, regulation or order thereunder.

18.   The Commission has jurisdiction over the forex solicitations and transactions at
issue in this action pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C.
§ 13a-1, and Section 2(c)(2)(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C.
§ 2(c)(2)(C).

19.   Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as
amended, to be codified at 7 U.S.C. § 13a-1(e), because Windsor transacts business in this

District and certain transactions, acts, practices, and courses of business alleged in the

Complaint occurred, are occurring, or are about to occur within this District. Furthermore, an

alien may be sued in any judicial district. 28 U.S.C. § 1391(d) (2006).

### ii. Windsor's Solicitations and Forex Transactions

· 20.   Beginning on October 18, 2010 and continuing until November 30, 2011 (the

"relevant period"), Windsor solicited or accepted orders from United States customers who

were not eligible contract participants ("ECPs") to open leveraged forex trading accounts

through its website, http://www.windsorbrokersltd.com. This website is hosted by a server

located in San Antonio, Texas.

21.   During the relevant period, Windsor solicited or accepted orders from United

States customers who were not ECPs to open leveraged forex trading accounts through what it

referred to as "Business Introducers" who were independent agents, both foreign and from the

United States, who received a commission for introducing clients to Windsor.

22.   During the relevant period, as advertised on its website, Windsor offered

individual customers the opportunity to trade a variety of financial instruments, including

forex, through one of five different types of accounts:  an "Executive" account that required an

initial deposit of $250,000; a "Mega" account that required an initial deposit of $5,000; a

"Standard" account that required an initial deposit of $2,500; a "Mini" account that required an

initial deposit of $250 and a "Micro" account that required an initial deposit of $100.  The

amounts required to fund these accounts were quoted in United States dollars.

23.   During the relevant period, customers could open trading accounts by submitting

information online through Windsor's website, by downloading the account opening

documents from the website and mailing the completed documents to Windsor, or by

completing account opening documents supplied to them by a "Business Introducer."

24.     During the relevant period, the Windsor Account Opening Documents included a Client Account Application Form, a "Client Account Agreement," a Risk Disclosure Statement, and an Online Access Agreement. These various documents described the processes of entering trades, the rights and responsibilities of the client and Windsor, and various disclaimers and notices regarding customers' rights and responsibilities.

25.     During the relevant period, the Client Account Application asked that the prospective client enter certain information, such as her name, address, including country of residence, telephone and email contact information, and nationality.

26.     During the relevant period, Windsor failed to inquire whether its United States customers were ECPs although, in some instances, it asked its United States customers to complete a "Know Your Client" (or "K.Y.C.") form. However, the K.Y.C. form only asked if United States customers had a net worth of "less than $100,000," "$100, 000 to $250,000" or "more than $250,000," and thus did not seek information sufficient to ascertain whether a United States customer was an ECP. In fact, during the relevant period, Windsor allowed individual United States customers who did not have total assets of $5 million to open accounts.

27.     During the relevant period, to complete the account opening procedure, the United States customer was required to fund its account by using one of various options and could do so with any major currency; however, the amounts deposited by customers were automatically converted into U.S. dollars.

28.     During the relevant period, Windsor offered to act as a counterparty to and solicited and accepted orders from at least ten United States retail forex customers.

7

29. During the relevant period, Windsor failed to inquire whether a prospective United States customer had the ability or the business need to accept foreign currency into its bank account.

30. During the relevant period, Windsor engaged in retail forex transactions with non-ECP United States customers that neither resulted in delivery within two days nor created an enforceable obligation to deliver between a seller and a buyer who had the ability to deliver and accept delivery, respectively, in connection with its lines of business. Rather, these retail forex transactions remained open from day to day and ultimately are offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

31. Windsor acted as a retail foreign exchange dealer ("RFED") during the relevant period by acting as a counterparty for United States customers to trade forex at Windsor until November 30, 2011.

32. Windsor has never been registered with the Commission as an RFED or in any other capacity.

33. Windsor is not exempt from registration.

### iii. The Commission Enacted New Regulations Effective October 18, 2010

34. On October 18, 2010, the Commission enacted new regulations implementing certain provisions of the Dodd-Frank Act, and the CRA, to be codified at 7 U.S.C. §§ 1 *et seq.*, with respect to forex transactions.

35. As detailed below, the new regulatory scheme requires that a person offering to be, or acting as, the counterparty to certain retail forex transactions register with the Commission as an RFED.

36. As detailed below, the Court finds that Windsor solicited or accepted orders from certain United States customers or potential United States customers in connection with certain retail forex transactions and acted as the counterparty to retail forex transactions with certain persons, all without being properly registered with the Commission as is required by the Act, as amended, and the Regulations.

### iv. Windsor Solicited or Accepted Orders From Non-Eligible Contract Participants

37. At least during the relevant period, Windsor solicited or accepted orders from United States customers who were not ECPs, which are defined by Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a, in relevant part as individuals with total assets in excess of (i) $10 million; or (ii) $5 million and who enter the transactions to manage the risk associated with assets owned or liabilities incurred, or reasonably likely to be owned or incurred, by the individuals.

### v. Windsor Offered or Entered into Forex Transactions Described in Section 2(c)(2)(C) of the Act, as amended

38. At least during the relevant period, Windsor offered and entered into forex transactions described in Section 2(c)(2)(C) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C), which includes forex transactions offered to, or entered into with, a non-ECP on a "leveraged or margined basis" and was not a counterparty that is exempted from registration.

### vi. Windsor Acted as a Retail Foreign Exchange Dealer

39. At least during the relevant period, Windsor acted as an RFED, which is defined by Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2011), as "any person that is, or that offers to be, the counterparty to a retail forex transaction" with certain exceptions which do not apply to Windsor.

### vii. Windsor Violated Section 2(c)(2)(C) of the Act

40.    Windsor violated Section 2(c)(2)(C) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C), by soliciting, offering to take, and taking orders from non-eligible contract participants ("non-ECPs") in connection with forex transactions at an RFED without being properly registered.

### viii. Windsor Violated Regulation 5.3(a)(6)(i)

41.    Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2011), took effect on October 18, 2010 and requires RFEDs to be registered.

42.    During the relevant period, Windsor acted as an RFED but failed to register with the Commission as an RFED.

### ix. Permanent Injunctive and Other Equitable Relief and Penalties Under the Act Are Warranted

43.    Windsor has engaged, is engaging, or is about to engage in acts and practices that violate Section 2(c)(2)(C) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C), and Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2011).

44.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that Windsor will continue to engage in the acts and practices alleged in the Complaint or in similar acts and practices that violate the Act and Regulations. Furthermore, the nature of Windsor's violations during the relevant period and the need to deter others from committing similar violations of the Act and Regulations warrants the imposition of a civil monetary penalty. The imposition of ancillary equitable relief is also necessary to carry out the objectives of the Act and Regulations.

## IV.    PERMANENT INJUNCTION

**THE PARTIES AGREE AND IT IS HEREBY ORDERED THAT:**

45.    Windsor, all persons insofar as they are acting in the capacity of Windsor's officers, agents, servants, employees, and attorneys, and all persons insofar as they are acting in active concert or participation with Windsor who receive actual notice of this Consent Order by personal service or otherwise, are permanently restrained, enjoined, and prohibited from directly or indirectly:

A.    Engaging in any conduct in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), including, but not limited to, soliciting or accepting orders from any United States customer or potential United States customer who is a non-ECP in connection with forex transactions without registering with the Commission; and

B.    Engaging in any conduct in violation of Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i) (2011), including, but not limited to, offering to be the counterparty to United States customers' forex transactions without registering with the Commission.

## V.    WINDSOR WEBSITES

**IT IS FURTHER ORDERED THAT:**

46.    Windsor and all persons insofar as they are acting in the capacity of Windsor's officers, agents, servants, employees, and attorneys shall within five (5) days of the date of entry of this Consent Order publish on all websites owned or otherwise maintained by Windsor, including, but not limited to, http://www.windsorbrokersltd.com, a prominently displayed notice stating, "Windsor does not provide services for United States customers" ("Website Notification").

47.    Windsor, all persons insofar as they are acting in the capacity of Windsor's officers, agents, servants, employees, and attorneys, and all persons insofar as they are acting in active concert or participation with Windsor who receive actual notice of this Consent Order

11

by personal service or otherwise, are permanently restrained, enjoined, and prohibited from directly or indirectly contradicting, in any manner whatsoever, the Website Notification.

48.    The provisions contained in Part V of this Consent Order shall remain in effect unless and until Windsor properly registers with the Commission.

## VI.    LIQUIDATION OF UNITED STATES CUSTOMER ACCOUNTS

**IT IS FURTHER ORDERED THAT:**

49.    Windsor states that it has liquidated all of its U.S. customers' accounts and that no U.S. customers have any open positions in any accounts at Windsor.

## VII.    TRADING PROHIBITION

50.    Windsor, all persons and entities insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of Windsor, and all persons and entities insofar as they are acting in concert or participation with Windsor who receive actual notice of this order by personal service or otherwise, shall be permanently prohibited, enjoined and restrained from directly or indirectly:

A.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a) on behalf of any U.S. customers;

B.    Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2011) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) ("forex contracts"), for any U.S. customers;

C.    Controlling or directing the trading for or on behalf of any U.S. customer, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts; and

D.    Soliciting, receiving, or accepting any funds from any U.S. customers for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts.

12

51. The provisions contained in Part VII of this Consent Order shall remain in effect unless and until Windsor properly registers with the Commission.

## VIII.     CERTIFICATION OF COMPLIANCE

**IT IS FURTHER ORDERED THAT:**

52. Within twenty (20) days of the date of entry of this Consent Order, Windsor shall deliver to the Commission in the manner required by Part X of this Consent Order a written certification that it has complied with the requirements contained in Parts V and VI of this Consent Order. Such certification shall further include:

A.     A list of all websites on which the Website Notification has been published; and

B.     A copy of all websites showing the Website Notification;

C.     A list of all United States customers to whom the Customer Notification was delivered, including name, account number, date of delivery, and means of delivery;

D.     A list of all United States customer accounts, including name, account number, email address, phone number, and mailing address, in which Windsor liquidated open positions from the Customer Notification delivery date to and including the Liquidation Date, along with the net realized gain or loss on the liquidated positions, the final balance of each account, the total amount of funds returned, and the means by which funds were returned; and

E.     A list of all United States customers, including name, account number, email address, phone number, and mailing address, for which Windsor transferred funds to the Escrow Account, including a description of the attempt(s) made to return funds to each customer and the amount of funds transferred to the Escrow Account for each customer.

## IX.     CIVIL MONETARY PENALTY

**IT IS FURTHER ORDERED THAT:**

53. Upon the date of entry of this Consent Order, Windsor is hereby liable for, and a judgment is entered against Windsor to pay, a civil monetary penalty in the amount of one hundred forty thousand dollars ($140,000) ("CMP Obligation"), plus post-judgment interest.

13

54.    If Windsor fails to satisfy its CMP Obligation within ten (10) days of the date of

the entry of this Consent Order, then post-judgment interest shall accrue on the CMP

Obligation beginning on the date of entry of this Consent Order and shall be determined by

using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to

28 U.S.C. § 1961.

55.    Windsor shall pay the CMP Obligation by electronic funds transfer, U.S. postal

money order, certified check, bank cashier's check, or bank money order. If payment is to be

made other than by electronic funds transfer, the payment shall be made payable to the

Commodity Futures Trading Commission and sent to the following address:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN:  Accounts Receivables – AMZ 340
> E-mail Box:  9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone:  (405) 954-5644

If payment by electronic funds transfer is chosen, Windsor shall contact Linda Zurhorst or her

successor at the address above to receive payment instructions and shall fully comply with those

instructions. Windsor shall accompany payment of the CMP Obligation with a cover letter that

identifies Windsor and the name and docket number of this proceeding. Windsor shall

simultaneously transmit a copy of the cover letter and the form of payment to: (1) the Director,

Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre,

1155 21st Street, NW, Washington, D.C. 20581; and (2) the Chief, Office of Cooperative

Enforcement, Division of Enforcement, Commodity Futures Trading Commission, at the same

address.

14

## X.   NOTICES

**IT IS FURTHER ORDERED THAT:**

56.    All notices required to be given by this Consent Order shall be filed electronically

with the Court and/or sent via certified mail, return receipt requested, as follows:

Notice to Plaintiff Commission:

> Director of the Division of Enforcement
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street NW
> Washington, D.C. 20581

> and

> Susan B. Padove
> Senior Trial Attorney
> Division of Enforcement
> Commodity Futures Trading Commission
> 525 W. Monroe St.
> Suite 1100
> Chicago, IL 60661

Notice to Defendant Windsor:

> Windsor Brokers, Ltd.
> c/o Mr. Hanna N. I. Abu Aitah, Managing Director
> P.O. Box 55478, by-3724
> Limassol, Cyprus

> Windsor Brokers, Ltd.
> c/o Gary Carman and Nicolas Watkins
> GrayRobinson, P.A.
> 1221 Brickell Avenue
> Miami, FL 33131

All such notices to the Commission shall reference the name and docket number of this

action.

57.    Change of Address/Phone: Until such time as Defendant satisfies in full its CMP

Obligation as set forth in this Consent Order, Defendant shall provide written notice to the

Commission by certified mail of any change to its telephone number and mailing address within ten (10) calendar days of the change.

### XI. CONTINUING JURISDICTION OF THIS COURT

**IT IS FURTHER ORDERED THAT:**

58.     This Court shall retain jurisdiction over this action to implement and carry out the terms of this Consent Order, to ensure compliance with this Consent Order, and for any other purpose relevant to this action,.

### XII. COLLATERAL AGREEMENTS

**IT IS FURTHER ORDERED THAT:**

59.    Windsor shall immediately notify the Commission in the manner required by Part X of this Consent Order if it makes any agreement with any United States customer regarding the liquidation of that customer's account pursuant to Part VI of this Consent Order that would alter, modify, or otherwise vary the terms thereof that is outside the specific terms of Part VI of this Consent Order and shall provide immediate evidence to the Commission of any such agreement.

### XIII. MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

**A.      Entire Agreement and Amendments**

60.    This Consent Order incorporates all of the terms and conditions of the settlement between the Commission and Windsor. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless it is: (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by order of this Court.

**B.    Invalidation**

61.    If any provision of this Consent Order or the application of any provision to any person or circumstance is held to be invalid, the remainder of the Consent Order and the application of the provision to any other person or circumstance shall not be affected by such holding.

**C.    Waiver**

62.    The failure of any party hereto at any time to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

**D.    Counterparts and Execution**

63.    This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by facsimile, email, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by facsimile or email shall be deemed for all purposes as constituting good and valid execution and delivered by such party of this Consent Order.

E.    **Authorization**

64.    Hanna N.I. Abu Aitah hereby warrants that he is the Managing Director of Windsor, that

this Consent Order has been duly authorized by Windsor, and that he has been duly

empowered to sign and submit this Consent Order on behalf of Windsor.

**IT IS SO ORDERED.**

Date: _____3/6_____, 2012          _____Elaine E Bucklo_____

Elaine E. Bucklo
United States District Judge

CONSENTED TO AND APPROVED BY:

Date: _____March 5_____, 2012          _____Susan F Padove_____

Susan B. Padove
Senior Trial Attorney
Commodity Futures Trading Commission
525 W. Monroe St.
Suite 1100
Chicago, IL  60661
Counsel for Plaintiff

CONSENTED TO AND APPROVED BY:

Date: _____2nd Feb_____, 2012

Mr. Hanna N. I. Abu Aitah
Managing Director
on behalf of Defendant Windsor Brokers, Ltd.

CONSENTED TO AND APPROVED AS TO FORM ONLY BY:

Date: Feb. 14, 2012, 2012

Gary Carman
GrayRobinson, P.A.
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Counsel for Defendant

18